UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACY LYNN MCGLOWN,                    )
                                       )
                    Plaintiff,         )
                                       )
          v.                           )    No.  4:11CV1477 FRB
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )


**MEMORANDUM AND ORDER**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.   All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.  Procedural History

        On September 5, 2006, plaintiff Tracy Lynn McGlown filed
an application for Disability Insurance Benefits pursuant to Title
II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an
application for Supplemental Security Income pursuant to Title XVI
of the Act, 42 U.S.C. §§ 1381, et seq., in which she alleged that
she became disabled on July 14, 2004.   (Tr. 147-50, 151-53.)   On
initial consideration, the Social Security Administration denied
plaintiff's claims for benefits.   (Tr. 77-78, 79-80, 86-90.)   On
February 6, 2008, upon plaintiff's request, a hearing was held
before an Administrative Law Judge (ALJ) at which plaintiff
testified and was represented by counsel.   (Tr. 31-74.)   A

supplemental hearing was held on June 17, 2009, at which plaintiff and a vocational expert testified. (Tr. 23-30.) On June 30, 2009, the ALJ denied plaintiff's claims for benefits, finding that vocational expert testimony supported a decision that a person with plaintiff's residual functional capacity (RFC) could perform work as it exists in the national economy. (Tr. 10-21.) On June 22, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-3.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks review of the Commissioner's final adverse determination arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ erred by relying on a State agency opinion rendered by a non-medical, single decision-maker to find plaintiff not disabled. Plaintiff also claims that her RFC, as determined by the ALJ, precludes employment. Plaintiff further contends that the ALJ erred in his failure to find plaintiff's pain to be a severe impairment. Finally, plaintiff argues that the ALJ erred by soliciting opinions from three vocational experts and relying on expert testimony which was based on inconsistent hypothetical questions. Plaintiff asks the Court to reverse the decision of the Commissioner or remand the matter for further proceedings.

## II. Testimonial Evidence Before the ALJ

A. <u>February 6, 2008, Administrative Hearing</u>

At the hearing on February 6, 2008, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-one years of age. Plaintiff was separated from her husband and had two children, ages twenty-three and eighteen. (Tr. 37.) Plaintiff graduated from high school and had six college credits. Plaintiff received no other vocational training. Plaintiff received assistance through food stamps and Medicaid. (Tr. 39-40.)

Plaintiff's signed work history reports show that from 1986 to 1996, plaintiff worked as a manager at a restaurant. From 1996 to 1997, plaintiff worked as a postal worker. From 1997 to 1999, plaintiff worked as a dietary aide at a nursing home. From 1999 to 2001, plaintiff worked as a teaching assistant at a church. From 2002 to 2004, plaintiff worked as a manager at a restaurant. (Tr. 222.) From February through August 2006, plaintiff worked part-time as a cook at LMW Learning Center. (Tr. 239.)

Plaintiff testified that she last worked in August 2006 for a daycare. Plaintiff reported that her hours were continually being decreased until she was told that she was no longer needed. Plaintiff testified that she has not worked in or applied for any employment positions since August 2006 because of her hospital stays, medications, and back pain. (Tr. 42.)

Plaintiff testified that she was diagnosed with cervical

cancer in July 2004 for which she was treated with chemotherapy and radiation therapy. Plaintiff testified that she was currently cancer free. Plaintiff testified that she continues to experience reactions to her radiation therapy. Plaintiff testified that subsequent to treatment, she experienced a lot of pain and was limited in her ability to lift because of related bladder problems. Plaintiff testified that she cannot lift over ten pounds. (Tr. 58-60.)

Plaintiff testified that her cancer treatments caused her to have problems with her bladder and kidneys and that stents were implanted. Plaintiff testified that the stents had to be periodically replaced because of painful infections, and that they were eventually removed in January 2007. Plaintiff testified that the stent-replacement procedure usually was a one-day procedure, but that she sometimes stayed in the hospital for longer periods. (Tr. 61-62, 70-71.)

Plaintiff testified that she also experiences diarrhea and constipation and takes medication to control the conditions. (Tr. 63.)

Plaintiff testified that she previously worked for a catering business, and that there was a workplace shooting at that business in April 2006. (Tr. 41-43.) Plaintiff testified that, although she suffered from depression prior to the shooting, the incident exacerbated the condition. Plaintiff testified that she now feels that she does not know if someone is "going to do

something" to her, so she stays inside to stay safe. Plaintiff testified that she cries every day when she thinks about the incident and of her inability to work. (Tr. 64-65.) Plaintiff testified that she sometimes felt suicidal but has made no attempts. Plaintiff testified that she sometimes hears her mother's voice. Plaintiff testified that she had difficulty with concentration and finishing things she has started. (Tr. 67.) Plaintiff testified that she has difficulty with stress and becomes angry. Plaintiff testified that she also has nightmares for which she was recently prescribed medication. (Tr. 73.) Plaintiff testified that she was currently seeing a psychologist and a psychiatrist on a weekly basis. (Tr. 65-66.)

Plaintiff testified that she takes Percocet every day for back pain. (Tr. 53-54.) Plaintiff testified that she takes a muscle relaxant once or twice a week instead of Percocet when she has less pain. (Tr. 55-56.) Plaintiff testified that she also takes medication for depression as well as Clonazepam to help her "get out into the world." (Tr. 54-55.) Plaintiff testified that she experiences nausea, sleepiness, and dizziness as side effects of her medications and must lie down because of them. Plaintiff testified that she previously would lie down and sleep during her lunch periods at work. (Tr. 57-58, 72.)

Plaintiff testified that she experiences lower abdominal and lower back pain. (Tr. 60.) Plaintiff testified that sitting worsens the back pain, but that heat helps. (Tr. 71.) Plaintiff

testified that taking Percocet relieves the back pain, but that the pain returns when she is taken off of Percocet. Plaintiff testified that her prescriptions for Percocet are then resumed. (Tr. 60.) Plaintiff testified that taking Ditropan helps her abdominal pain. (Tr. 71.)

As to her exertional abilities, plaintiff testified that she can sit for up to an hour and stand for about an hour. Plaintiff testified that she can walk about two blocks and can lift no more than ten pounds. Plaintiff testified that she has difficulty bending and cannot crawl. Plaintiff testified that she can climb a flight of stairs. (Tr. 68-69.)

As to her daily activities, plaintiff testified that she gets up in the morning between 6:30 and 7:00 a.m. and goes to bed at night around 8:00 p.m. Plaintiff testified that she takes naps throughout the day after she takes her medication because the medication causes sleepiness and dizziness. Plaintiff testified that she lies down six to eight hours every day and cannot make it through an entire day without lying down. (Tr. 49-50, 72.) Plaintiff testified that she also reads and watches television during the day. Plaintiff testified that she is able to wash dishes, cook a light meal, and make beds. Plaintiff testified that she cannot sweep, mop, or vacuum because of her back pain. (Tr. 49-50.) Plaintiff testified that she gets along well with people but is not involved in any clubs or organizations. Plaintiff testified that she has no hobbies. (Tr. 51.) Plaintiff testified

that she does not go grocery shopping because of the previous workplace incident. (Tr. 68.) Plaintiff testified that she is able to care for her personal needs. (Tr. 51.) Plaintiff testified that her driver's license was suspended, but that she was nevertheless not to drive because of her medications. Plaintiff testified that she took the Metro Link to the hearing site. (Tr. 38.)

B.  Vocational Expert Interrogatories

1.  *Dr. W. Glenn White; October 30, 2008*

On October 30, 2008, Dr. W. Glenn White, a vocational expert, answered written interrogatories put to him by the ALJ.

Dr. White characterized plaintiff's past relevant work as a postal clerk, caterer helper, and teacher's aide as semi-skilled and light; as a food service manager as skilled and light; as a deli-cutter-slicer and fast food worker as unskilled and light; and as a telephone solicitor as semi-skilled and sedentary. (Tr. 281.)

Dr. White was asked to consider an individual of plaintiff's age, education, and work history and to further assume

> that the claimant has the residuals of chemotherapy and radiation therapy for stage IIB squamous cell carcinoma of the cervix; recurrent ureteral obstructions with stent insertions; recurrent pyelonephritis; major depressive disorder; and post-traumatic stress disorder. Further assume that the claimant can lift and carry up to 10 pounds occasionally and 5 pounds frequently; sit for a total of six hours of an 8-hour work day; stand or walk for a total of 2 hours of an 8-hour work day; and occasionally climb,

> balance, stoop, crouch, kneel, and crawl.
> Assume that the claimant must avoid
> concentrated exposure to extreme heat, fumes,
> odors, or dust, and she must avoid
> concentrated exposure to hazardous machinery
> and unprotected heights.  In addition, assume
> that the claimant is restricted to simple
> repetitive tasks with no more than occasional
> interaction with coworkers, supervisors, or
> the public.

(Tr. 281-82.)

Dr. White responded that such a person could not perform any of plaintiff's past relevant work, nor any other work in the national or regional economy.  (Tr. 282.)

Dr. White was then asked to consider an individual of plaintiff's age, education, and work history and to consider the individual to have the same impairments as set out in the first hypothetical.  Dr. White was asked to "[f]urther assume that the claimant's daily activities include lying down, periodically throughout the day for the majority of an 8 hour period, and that her need to lie down cannot be met with only a 30 minute lunch period and two 15-minute breaks."  (Tr. 293.)  Dr. White responded that the need to lie down as described would exceed that which is usually allowed in time away from the job, and that, therefore, such a person could not perform any of plaintiff's past relevant work, nor any other work in the national or regional economy.  (Tr. 293.)

Finally, Dr. White was asked to consider an individual of plaintiff's age, education, and work history and to consider the

individual to have the same impairments as set out in the first hypothetical. Dr. White was then asked to further assume that the claimant had a GAF score of 50. In response, Dr. White stated that a person with a GAF score of 50 could not sustain a job in a competitive labor market inasmuch as such a score reflects serious symptoms related to a general level of functioning. (Tr. 293-94.)

    2.  *Brenda Young; April 6, 2009*

    On April 6, 2009, Brenda Young, a vocational expert, answered written interrogatories put to her by the ALJ.

    Ms. Young characterized plaintiff's past relevant work as a fast food manager, assistant teacher, and postal clerk as semi-skilled and medium; as a dietary aide as unskilled and medium; as a telemarketer as unskilled and sedentary; and as a deli clerk as unskilled and light. (Tr. 311.)

    Ms. Young was asked to consider an individual forty-one years of age with a high school education, and that such person was "capable of performing sedentary work, lifting 10 lbs. occasionally, less than 10 frequently, occasional balance, stoop, crouch, kneel, crawl, no machinery, Heights, sit 6/8, stand, walk 2/8, no concentrated exposure to noise, dust, fumes, gases, simple, repetitive tasks, occasional interaction with co-workers, supervisors and public." (Tr. 312.) Ms. Young responded that such a person could not perform any of plaintiff's past relevant work, but could perform other work in the economy such as small product assembly at the sedentary and unskilled level, of which 3,000 such

jobs existed in the St. Louis area.  (Tr. 312.)

C.    June 18, 2009, Administrative Hearing

             At the hearing on June 18, 2009, the ALJ noted that the
purpose of the hearing was to obtain testimony from a vocational
expert since one was not present at the earlier hearing.  The ALJ
recited the history of the case with respect to vocational expert
testimony, stating specifically that Dr. White had died prior to
completing the interrogatories sent to him, and that therefore
interrogatories were sent to and completed by Ms. Young.  The ALJ
noted that, inasmuch as Ms. Young had responded to the
interrogatories, there was no need for the current hearing.  (Tr.
24-25.)  Plaintiff's counsel pointed out to the ALJ that Dr. White
indeed responded to the interrogatories and that such responses
were a part of the file.  (Tr. 25-26.)  Counsel then proceeded to
question the vocational expert who was present at the hearing.

       1.   Testimony of Vocational Expert

             An unnamed vocational expert testified at the
supplemental hearing in response to questions posed by counsel.[1]

             Counsel asked the vocational expert to consider Dr.
Clarke's description of plaintiff as having a "fair ability to deal
with the public, use judgment, deal with work stresses, function
independently, and be attentive and concentrate, behave in an
emotionally stable manner, relate predictably in social situations,

_____

        [1]In his written decision, the ALJ identified this expert as
Vincent Stock.  (Tr. 13.)

- 10 -

and demonstrate reliability." (Tr. 26.) Counsel defined "fair" as meaning "the ability to function is seriously limited" and asked the expert whether such restrictions would preclude an individual from performing unskilled, sedentary work. (Tr. 26.) In response, the expert testified that such a person "would have a significant difficulty in terms of being able to maintain employment." (Tr. 27.)

### 2.    *Plaintiff's Testimony*

Upon the conclusion of the vocational expert's testimony, the ALJ posed questions to plaintiff to which she testified as follows:

Plaintiff testified that she was currently working as a dietary aide at Delmar Gardens setting tables and preparing plate meals for the residents. Plaintiff testified that she began working at Delmar Gardens in September 2008. (Tr. 28.) Plaintiff testified that it was a stand up/sit down job and that the heaviest thing she lifted was a gallon of milk. Plaintiff testified that she worked five hours a day, three or four days a week. Plaintiff testified that she attempted to work eight hours a day, but that putting in such time was stressful and tiresome so she resumed her part time hours. (Tr. 29.)

### III.    Medical Records

A biopsy performed on August 6, 2004, showed plaintiff to have Stage II-B cervical cancer whereupon Dr. Imran Zoberi recommended that plaintiff undergo chemotherapy and radiation

treatment. (Tr. 325, 344-45.) On August 30 and September 3, 2004, Dr. Zoberi and Dr. Barbara Buttin, respectively, wrote "To Whom It May Concern" that plaintiff would be unable to work due to side effects from radiation and chemotherapy, and that such treatment was expected to continue through October 25, 2004. (Tr. 350, 351.)

Plaintiff was admitted to Barnes Jewish Hospital on September 16, 2004, for chemoradiation treatment with the placement of intracavitary radium implants. Plaintiff had already received fourteen fractions of external beam treatment. Plaintiff tolerated the procedure well and was discharged on September 19, 2004. Plaintiff's discharge medications included Percocet for pain, Zofran and Compazine for nausea and vomiting, and Senokot[2] for constipation. Plaintiff was instructed to engage in activity as tolerated and to resume a regular diet as tolerated. (Tr. 320-21, 328-29, 332.) Plaintiff underwent a second radium implant on September 30, 2004. (Tr. 326-27.)

Plaintiff completed her treatment on October 11, 2004, and reported to Dr. Greg Franklin on November 24, 2004, that she was doing well. Plaintiff had no complaints other than worsening hot flashes since the end of her treatment. Upon examination, Dr. Franklin noted there to be no clinical evidence of disease. (Tr. 333-34.)

---

[2]Senokot is the commercial brand name for Senna, medication used on a short-term basis to treat constipation. Medline Plus (last revised Nov. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601112.html>.

A whole body Positron Emission Topography (PET) performed on January 6, 2005, showed interval improvement in the size and activity of plaintiff's cervical cancer. Persistent rim of increased activity with a central area of necrosis was suggestive of residual disease. No evidence of local or metastatic disease was noted. (Tr. 428-29.)

Plaintiff returned to Dr. Zoberi on January 11, 2005, and reported no complaints other than a poor appetite. Plaintiff reported having no pain. Physical examination was unremarkable. Dr. Zoberi noted the status of plaintiff's disease to be uncertain and Flagyl, an antibiotic, was prescribed. Plaintiff was instructed to return in one month. (Tr. 336-37.)

In a questionnaire completed for disability determinations on January 11, 2005, Dr. Buttin of Washington University's Division of Gynecologic Oncology reported that plaintiff's treatment for cervical cancer caused gastrointestinal toxicity which resulted in pain and nausea, and that plaintiff was thereby limited in her ability to perform day-to-day activities. (Tr. 343.)

Plaintiff visited the Gynecologic Oncology Clinic at Barnes Jewish Hospital on January 20, 2005, for follow up and reported having low abdominal pain since Christmas. The results of the January 2005 PET were noted. Plaintiff's current medications

were noted to include Zofran, Percocet, Senokot, and Oxycontin.[3] A follow up biopsy was scheduled to rule out possible persistent/ recurrent disease. (Tr. 401.)

Cervical biopsy performed on February 17, 2005, showed no definite evidence of malignancy. (Tr. 367.)

On February 18, 2005, plaintiff underwent ureteral stent placement for distal ureteral malignant obstruction on the left side. (Tr. 374-75.)

Plaintiff was admitted to Barnes Jewish Hospital on February 21, 2005, with complaints of back pain, pain in her left and right sides, painful urination, and nausea and vomiting. It was noted that plaintiff was recently hospitalized for left hydronephrosis (kidney swelling) for which she underwent left ureteral stent placement. Plaintiff's medications were noted to include Oxycontin and Oxycodone. Plaintiff underwent left stent replacement and reported improvement in her pain. Plaintiff was discharged on February 26, 2005, and was prescribed MS Contin,[4]

---

[3]Oxycontin and Percocet are the commercial brand names for the medication Oxycodone, which is used to relieve moderate to severe pain. Medline Plus (last revised Oct. 15, 2011)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[4]MS Contin is the commercial brand name for oral morphine, medication used to relieve moderate to severe pain. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682133.html>.

MSIR,[5] Detrol,[6] and Bactrim (an antibiotic) upon discharge. Plaintiff was instructed to return for follow up in one and one-half weeks. (Tr. 353-55.)

Plaintiff visited Gynecologic Oncology on March 23, 2005. Plaintiff's history of cervical cancer and treatment was noted with no evidence of current disease. Plaintiff's medications were noted to include Zofran, Percocet, and Senokot. Plaintiff's prescription for Percocet was refilled for pain control. (Tr. 400.)

In a letter dated March 28, 2005, to "To Whom It May Concern," Dr. Buttin wrote that plaintiff was unable to work because of moderate to severe side effects she experienced as a result of her cancer treatment. Dr. Buttin wrote that such side effects required plaintiff to take chronic narcotic pain medication which limited her ability to function in a normal capacity. (Tr. 461.)

Plaintiff underwent routine stent change on March 29, 2005, without complication. (Tr. 427.)

A repeat whole body PET performed on April 5, 2005, showed no definitive evidence of residual local cervical cancer and no evidence of distant metastatic disease. (Tr. 425-26.)

Plaintiff underwent routine stent change on May 24, 2005, without complication. (Tr. 424.)

---

[5]Morphine sulfate immediate release.

[6]Detrol is used to relieve urinary difficulties. <u>Medline Plus</u> (last reviewed Sept. 1, 2010)<<u>http://www.nlm.nih.gov/medlineplus/</u> druginfo/meds/a699026.html>.

Plaintiff visited the Tumor Clinic at Barnes Jewish Hospital on August 24, 2005, for follow up. It was noted that plaintiff was overdue for stent replacement. Plaintiff's medications were noted to include MS Contin and MSIR, and plaintiff's medications were refilled. (Tr. 399.)

An attempted stent change on August 29, 2005, was unsuccessful due to pain experienced by plaintiff with moderate conscious sedation. The procedure was to be rescheduled so that plaintiff could be placed under general anesthesia. (Tr. 423.)

Plaintiff was admitted to Barnes Jewish Hospital on August 31, 2005, for recurrent pyelonephritis (kidney infection) and urinary tract infection. It was noted that plaintiff required stent replacement approximately every three months due to recurring urinary tract infections. Plaintiff currently denied fever, chills, or back pain. Plaintiff's medications were noted to include MS Contin, MSIR, and Detrol. Plaintiff was discharged the following date in stable condition and was instructed to engage in activities as tolerated. Plaintiff's medications upon discharge were Cipro (an antibiotic), Percocet, and Detrol. (Tr. 358-59.)

Plaintiff visited the Tumor Clinic on November 16, 2005, for follow up. Plaintiff complained of fatigue. Plaintiff's medications were noted to include Percocet and MSIR. Plaintiff reported that she increased her use of Percocet given the lack of MSIR, and that she has had increased nausea and vomiting. It was noted that plaintiff was scheduled for a stent replacement the

following week.  Plaintiff's MSIR was refilled.  Plaintiff was instructed to return in three months.  (Tr. 398.)

Plaintiff was admitted to Barnes Jewish Hospital on February 10, 2006, with complaints of hematuria.  (Tr. 361-62.)  CT scans of the abdomen and pelvis performed that same date showed evidence consistent with either local disease extension or post-radiation fibrosis.  Local invasion or focal cystitis were also suggested.  It was noted that plaintiff previously underwent left ureteral stent placement for distal ureteric obstruction.  (Tr. 368-73.)  Plaintiff was discharged that same date with instruction not to lift weight in excess of ten pounds until further notice and to engage in light duty at work.  Upon discharge, plaintiff was prescribed Cipro, Detrol, Senokot, and Percocet.  (Tr. 361-62.)

Plaintiff underwent routine stent change on June 19, 2006, without complication.  (Tr. 434-442.)

Plaintiff visited the Tumor Clinic on August 2, 2006, for follow up.  Plaintiff complained of low pelvic pressure and pain. Plaintiff was taking no medications.  It was noted that plaintiff's stent was last replaced in June 2006.  Plaintiff refused a biopsy. Plaintiff was instructed to return in three months.  (Tr. 397.)

Plaintiff visited the Tumor Clinic on September 20, 2006, for follow up.  Plaintiff reported having bladder pain. Plaintiff's current medications were noted to include Percocet,

Senna, and Ditropan.[7]  (Tr. 396.)  A vaginal biopsy performed that same date showed inflammation with bacterial organisms.  (Tr. 365-66.)

A repeat whole body PET performed September 29, 2006, showed no definite evidence of residual or recurrent cervical cancer with no abnormal tracer accumulations about the cervix or lymph nodes.  A small amount of tracer was noted about the left ureteral stent.  (Tr. 445, 569.)

Plaintiff underwent a routine stent change on October 4, 2006, without complication.  (Tr. 447.)

On October 17, 2006, S. Greenberg completed a Physical RFC Assessment for disability determinations in which s/he opined that plaintiff could occasionally lift and carry ten pounds, and frequently lift and carry less than ten pounds; could stand and/or walk at least two hours in an eight-hour work day; could sit about six hours in an eight-hour work day; and was unlimited in her ability to push and/or pull.  It was further opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. It was further opined that plaintiff should avoid concentrated exposure to extreme heat, fumes, odors, gases, dusts, poor ventilation, and hazards.  Finally, it was opined that plaintiff had no manipulative or visual limitations.  (Tr. 454-59.)

On December 27, 2006, plaintiff visited the Gynecologic

---

[7]Ditropan (Oxybutynin) is used to treat symptoms of overactive bladder.  <u>Medline Plus</u> (last revised Dec. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682141.html>.

Oncology Clinic and reported having occasional abdominal pain which was controlled with Percocet. Plaintiff's current medications were noted to include Oxycodone-acetaminophen and Cipro. It was noted that plaintiff exhibited no new symptoms of recurring disease. A prescription for Percocet was given. (Tr. 542-43.)

In a Radiation Oncology Follow-Up note dated January 2, 2007, Dr. Zoberi noted that plaintiff complained of constipation secondary to her pain medications. Plaintiff was instructed to decrease her dosage of Percocet to improve her symptoms. Physical examination was unremarkable. (Tr. 466-67.)

On January 9, 2007, plaintiff visited the Psycho-Oncology Service at the Siteman Cancer Center for initial assessment regarding her dealing with cancer. Plaintiff reported feeling depressed for the past year. Plaintiff reported having passive suicidal ideation without intent or plan. Plaintiff reported her stressors to include separation from her husband and exposure to a homicide-suicide at her place of employment in April 2006. Plaintiff reported that she was not currently working because of side effects from her medications and because of pain. Melissa Jenkins-Fernandez, Psy.D., opined that plaintiff met the criteria for Major Depressive Disorder and had symptoms of Post Traumatic Stress Disorder. Between January 9 and June 27, 2007, plaintiff visited Dr. Jenkins-Fernandez on nine occasions for supportive counseling. On December 20, 2007, Dr. Jenkins-Fernandez reported that she could not speak to plaintiff's abilities regarding her

mental capacity for employment.  (Tr. 583-85.)

A Urography performed on January 16, 2007, showed minimal drainage from the left kidney into the bladder.  The left ureteral stent was removed and plaintiff was to be evaluated for left ureteral obstruction.  (Tr. 511, 515-26.)  Renal imaging performed January 19, 2007, showed evidence consistent with partial obstruction of the left kidney.  (Tr. 508.)  Follow up renal imaging performed March 21, 2007, showed interval resolution of the obstruction.  (Tr. 506.)

Follow up examination with the Gynecologic Oncology Clinic on March 21, 2007, was unremarkable.  (Tr. 539-40.)  During follow up examination on June 20, 2007, it was noted that plaintiff's current medications included Bactrim, Oxybutynin Chloride, Oxycodone-acetaminophen, and Venlafaxine.[8]  Plaintiff's prescriptions for Effexor, Percocet, and Ditropan were refilled. (Tr. 537-38.)

Plaintiff was admitted to the emergency department at Barnes Jewish Hospital on July 14, 2007, complaining of experiencing headaches for one week.  It was noted that plaintiff had been on multiple narcotics and ran out of Percocet, after which plaintiff's headaches had returned.  Plaintiff was given Oxycodone with acetaminophen, and the pain went away.  Plaintiff was prescribed such medication upon her discharge that same date.  (Tr.

---

[8]Venlafaxine (Effexor) is used to treat depression.  Medline Plus (last revised Jan. 15, 2012)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a694020.html>.

481-88.)

In a Radiation Oncology Follow-Up note dated July 31, 2007, Dr. Zoberi noted that plaintiff was doing well and reported having no pelvic pain. Physical examination was unremarkable. There was no clinical evidence of cervical cancer. (Tr. 464-65.)

CT scans of the abdomen and pelvis performed August 10, 2007, were unremarkable. No evidence of hydronephrosis was present, as well as no evidence of definite residual, recurrent, or metastatic disease. (Tr. 478-79.)

During her visit to the Gynecologic Oncology Clinic on September 19, 2007, plaintiff complained of chronic pain in her left lower back, without weakness or sharp pain. Physical examination was unremarkable with no tenderness noted throughout the exam. Plaintiff was instructed to return in three months. (Tr. 535-36.)

Renal imaging performed October 1, 2007, yielded normal results. (Tr. 473.)

During plaintiff's visit to the Gynecologic Oncology Clinic on October 10, 2007, plaintiff complained of pain in her left lower back which improved with a heating pad. Plaintiff's current medications were noted to include Bactrim, Oxybutynin Chloride, Oxycodone-acetaminophen, Venlafaxine, Cyclobenzaprine,[9]

---

[9]Cyclobenzaprine (Flexeril) is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. Medline Plus (last revised Oct. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

and Ranitidine.[10]  Physical examination showed point tenderness to the medial aspect of the sternum and iliac crest.  Flexeril was prescribed, and a barium enema x-ray was scheduled.  Plaintiff was also prescribed Zantac for GERD.  (Tr. 533-34.)

In a letter dated November 5, 2007, to "To Whom It May Concern," Dr. Israel Zighelboim of the Gynecologic Oncology Clinic recommended that plaintiff be excused from jury duty given her inability to sit for long periods of time due to side effects from her chemotherapy and radiation treatments.  (Tr. 529.)

Plaintiff followed up with the Gynecologic Oncology Clinic on December 19, 2007, and reported that her back pain had improved but that she continued to have left lower quadrant pain. Physical examination was unremarkable.  No change was made to plaintiff's medication regimen.  (Tr. 530-32.)

On December 21, 2007, Dr. Zighelboim completed a Physician's Assessment for Social Security Disability Claim in which he reported that plaintiff completed her treatment for cervical cancer in 2004 and currently had no evidence of disease; that plaintiff's endurance was not limited from a cancer standpoint; and that plaintiff could perform full-time sedentary employment in that she had no indication for limited activity. (Tr. 528.)

---

[10]Ranitidine (Zantac) is used to treat ulcers and gastroesophageal reflux disease (GERD).  Medline Plus (last reviewed Feb. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html>.

On December 31, 2007, Dr. Zoberi completed a Physician's Assessment for Social Security Disability Claim in which he reported that plaintiff was free of disease. Dr. Zoberi reported that he had no knowledge of plaintiff being limited in her endurance and opined that plaintiff could perform full-time sedentary employment. (Tr. 587.)

Plaintiff visited Dr. Tracy Norfleet on January 9, 2008, for the purpose of establishing primary care. Dr. Norfleet noted plaintiff's medical history and that plaintiff's current medications included Ranitidine, Ditropan, Flexeril, Bactrim, and Venlafaxine. Plaintiff complained of intermittent low back pain. Physical examination was unremarkable. Plaintiff was noted to be oriented times three and to have a normal mood. Plaintiff was instructed to return for follow up of recent onset of diarrhea. (Tr. 593-94.)

On January 10, 2008, plaintiff visited Marty Clarke, a physician assistant with Siteman Cancer Center, upon referral from Shannon Nanna, Psy.D. Plaintiff reported that since the workplace shooting, she has had increasing severe symptoms of low mood, frequent crying, and disturbing dreams. Plaintiff reported that she is often unable to leave her home due to panic and fear, and was unable to return to work because of her severe symptoms. Plaintiff reported that she would like to return to college and become a high school teacher. Dr. Clarke noted plaintiff to take Effexor at bedtime. Mental status examination showed plaintiff to

be open, pleasant, and cooperative but clearly in distress. Plaintiff's mood was noted to be anxious with liable affect. Plaintiff was noted to have frequent thoughts of death with disturbing, intrusive recollections of the traumatic event. Plaintiff's insight and judgment were noted to be good. Dr. Clarke diagnosed plaintiff with PTSD and assigned a GAF score of 50.[11] Plaintiff was prescribed Klonopin[12] for anxiety and was instructed to continue with Dr. Nanna for psychotherapy. Plaintiff was instructed to return to Dr. Clarke in two weeks. (Tr. 605-06.)

An enema performed January 16, 2008, showed no abnormalities. (Tr. 597.)

On January 17, 2008, Dr. Nanna reported that she had seen plaintiff on three occasions since December 17, 2007, upon her transfer from Dr. Jenkins-Fernandez. Dr. Nanna reported that because the primary purpose of therapy was to provide supportive services regarding cancer diagnoses, formal evaluations of daily functioning and mental status were not conducted. Dr. Nanna reported that plaintiff had discussed symptoms of PTSD related to

---

[11]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[12]Klonopin (Clonazepam) is used to relieve panic attacks. Medline Plus (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

the April 2006 workplace shooting and had exhibited symptoms such as generalized anxiety, avoidance of public areas, and recurrent violent nightmares. It was noted that plaintiff planned to continue with treatment. (Tr. 589.)

Plaintiff visited the Gynecologic Oncology Clinic on January 20, 2008, and complained of chronic low back pain. It was noted that such pain may be musculoskeletal/fibrosis in nature. Plaintiff was encouraged to use heating pads since such treatment improved her pain. Percocet was prescribed. Medications were also prescribed for urinary and fecal urgency as well as for constipation. (Tr. 668-71.)

Plaintiff returned to Dr. Norfleet on January 23, 2008, who noted plaintiff's diarrhea symptoms to have resolved. Plaintiff reported having left-sided back pain. Physical examination showed mild tenderness about the area without guarding. Plaintiff reported having seen Dr. Clarke and that she had been prescribed Clonazepam to help with sleep and nightmares. Dr. Norfleet noted plaintiff to have normal mood and affect. Plaintiff had disability forms with her, but Dr. Norfleet advised plaintiff that she could not complete them inasmuch as she had seen plaintiff only once. Dr. Norfleet advised plaintiff to follow up with her urologist regarding her back pain. (Tr. 591-92.)

Plaintiff visited Dr. Clarke on January 23, 2008, and reported that her medication had helped a lot. Plaintiff had improved mood; normal sleep, appetite, and energy; improved

concentration; and no more nightmares or intrusive recollections. It was noted that plaintiff was engaging in recreational activities such as going to the mall and the grocery store. Plaintiff reported having some episodes of anxiety and low mood but denied suicidal thoughts or self-harming behaviors. Dr. Clarke noted plaintiff's mood to be better, but plaintiff articulated continued suspicion of strangers and worries about being assaulted. Dr. Clarke instructed plaintiff to increase her dosage of Effexor and to continue with Dr. Nanna for psychotherapy. (Tr. 674-75.)

A renal sonogram dated January 30, 2008, showed no hydronephrosis. A thickened bladder wall, most likely secondary to radiation, was noted. (Tr. 596.)

A repeat whole body PET performed on February 7, 2008, showed no definitive evidence for recurrent or metastatic disease. A cystic structure within the deep pelvis was noted. Further evaluation was recommended. (Tr. 654-55.)

Plaintiff was admitted to Barnes Jewish Hospital on February 25, 2008, with complaints of nausea, vomiting, and recent suicidal ideation. It was noted that plaintiff had attempted suicide the previous week by medication overdose. Plaintiff reported that she was tired of being sick and wanted to go to sleep and not wake up. Physical examination showed tenderness and guarding to palpation along the lower left quadrant of the abdomen. An abdominal radiography was normal and showed no obstruction. Plaintiff received counseling and medication therapy during her

admission and was discharged on February 26, 2008. Upon discharge, plaintiff was prescribed Naproxen for pain, Clonazepam for anxiety, Colace and Senna for constipation, Prochlorperazine for nausea and vomiting, Venlafaxine to alleviate depression, Oxybutynin and Cyclobenzaprine for overactive bladder, Metronidazole (an antibiotic), and Ranitidine for GERD. (Tr. 607-52.)

Plaintiff returned to the Gynecologic Oncology Clinic for follow up on March 19, 2008. Physical examination was unremarkable. It was noted that an ultrasound performed for further evaluation of possible cyst yielded normal results, except for thickening of the bladder wall secondary to radiation therapy. Plaintiff's pain medication was changed to Percocet. (Tr. 663-67.)

Plaintiff visited Dr. Clarke on March 19, 2008, and reported that she felt depressed and that Effexor was not working. Plaintiff reported having no side effects from the medication. Plaintiff reported that she had improved sleep and increased appetite, but that she had decreased energy and decreased concentration. Plaintiff reported having hallucinations in that she hears someone calling her name, sees faces in pictures on the wall, and has delusions of people being in her home watching her. Plaintiff reported that she has had such experiences during the previous two years. Plaintiff denied suicidal thoughts or self-harming behaviors. Dr. Clarke noted plaintiff's current medications to include Bactrim, Oxybutynin Chloride, Oxycodone-acetaminophen, Cyclobenzaprine, Ranitidine, and Effexor. Upon

examination, Dr. Clarke concluded that plaintiff's symptoms had worsened and determined to add Risperdal to plaintiff's medication regimen to address psychosis.[13] Dr. Clarke instructed plaintiff to reduce her dosage of Klonopin. Plaintiff was instructed to return for follow up in one week. (Tr. 673.)

Plaintiff returned to Dr. Clarke on April 21, 2008, and reported feeling better. Plaintiff reported increased concentration and that she was engaging in recreational activities. Plaintiff reported having no hallucinations, delusions, suicidal thoughts, self-harming behaviors, obsessive rumination, or feelings of guilt. Mental status examination was essentially normal, with plaintiff's mood noted to be much better, her affect euthymic, and her insight and judgment noted to be fair. Dr. Clarke noted plaintiff to be making good progress and adjusted her dosage of Risperdal. (Tr. 716-17.)

Plaintiff visited Dr. Norfleet on May 5, 2008, with complaints of intermittent diarrhea and low back discomfort. Plaintiff reported that Naprosyn did not provide relief for the pain, and that she had previously taken Percocet. Physical examination was unremarkable. No tenderness was noted about the back. Dr. Norfleet noted plaintiff to have normal mood and affect and to have normal memory and judgment. Dr. Norfleet instructed

---

[13]Risperdal is used to treat symptoms of schizophrenia. Medline Plus (last revised Nov. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html>.

plaintiff to discontinue Percocet and Naprosyn, and Darvocet[14] was prescribed for back pain. An x-ray was ordered. (Tr. 680-81.)

Plaintiff returned to the Gynecologic Oncology Clinic on May 7, 2008, and complained of intermittent diarrhea and constipation, and of back pain. Physical examination was unremarkable. Plaintiff's pain medication was changed to Tramadol.[15] (Tr. 737-39.)

Plaintiff visited Dr. Clarke on May 14, 2008, and reported that she continued to hear voices and that she has conversations with them. Plaintiff reported that she believed the voices were from a spirit or the devil. Plaintiff also reported that she can read people's minds. Plaintiff reported having suicidal thoughts but did not want to die. Dr. Clarke noted plaintiff's mood to be okay and her affect to be restricted, depressed, and flat. Dr. Clarke determined to discontinue Risperdal and to start plaintiff on Abilify.[16] Dr. Clarke determined plaintiff's progress to be poor and instructed her to return in two weeks for follow up. (Tr. 714-15.)

On May 27, 2008, plaintiff reported to Dr. Clarke that

---

[14]Darvocet is used to relieve mild to moderate pain. _Medline Plus_ (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

[15]Tramadol is used to relieve moderate to moderately severe pain. _Medline Plus_ (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

[16]Abilify is used to treat the symptoms of schizophrenia. _Medline Plus_ (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html>.

she felt better. Mental status examination was normal and plaintiff reported having no hallucinations, delusions, or suicidal thoughts. Plaintiff was instructed to continue with her current regimen and to continue with Dr. Nanna for psychotherapy. (Tr. 712.)

Plaintiff visited Dr. Clarke on July 18, 2008, and reported that she ran out of Abilify two days prior. Dr. Clarke noted plaintiff's mood to be better and plaintiff reported having no hallucinations, delusions, or suicidal thoughts. Plaintiff was provided more Abilify and was instructed to continue with Effexor. (Tr. 710-11.)

Plaintiff visited Dr. Gowri Kularatna at Washington University Division of Gastroenterology on July 24, 2008, with complaints of low back pain, GERD symptoms, and bouts of diarrhea and constipation. Dr. Kularatna noted plaintiff's current medications to include Effexor, Percocet, Oxybutynin, Ranitidine, Tramadol, and Naproxen. Physical examination showed edema in the lower extremities and mild tenderness to palpation along the lower back. No spinal tenderness was noted with range of motion of the back. A colonoscopy and barium enema were scheduled. Plaintiff was prescribed Prevacid and was instructed to return in two months. (Tr. 699-700.)

Plaintiff visited the Gynecologic Oncology Clinic on August 6, 2008, and had no complaints other than ongoing back pain. Plaintiff reported the pain to be adequately relieved with

Percocet. Plaintiff reported her symptoms of psychosis to be well controlled. Physical examination was essentially unremarkable. No evidence of disease was noted. Plaintiff was diagnosed with chronic pelvic/back pain likely due to radiation fibrosis. Refills of Percocet were given with discussion of the need for decreased Percocet use. Naproxen was prescribed. (Tr. 734-36.)

A colonoscopy performed August 8, 2008, was essentially normal. (Tr. 684.) An upper GI endoscopy performed that same date was essentially normal. (Tr. 687-88.)

A repeat whole body PET performed on August 14, 2008, showed no evidence for recurrent or metastatic disease. (Tr. 719-20.)

Plaintiff visited Dr. Clarke on September 29, 2008, and reported that she had run out of Abilify and could no longer afford the medication due to lack of insurance coverage. Plaintiff's mood was noted to be good and plaintiff reported normal sleep, appetite, concentration, and energy. Plaintiff reported being engaged in recreational activities and not to have hallucinations, delusions, or suicidal/homicidal thoughts. Plaintiff was instructed to continue with Effexor and Abilify and was given samples of medication. (Tr. 708-09.)

Plaintiff returned to the Division of Gastroenterology on October 16, 2008, and reported continued GERD symptoms. Plaintiff also reported that she had been started on Oxycontin for her back pain and that the pain was better. Plaintiff's current medications

were noted to include Abilify, Oxybutynin, Oxycontin, and Effexor. Physical examination was unremarkable. It was noted that plaintiff worked in dietary at a nursing home. It was opined that plaintiff's constipation could be a side effect of her pain medication, but irritable bowel syndrome was to be ruled out. Plaintiff was instructed to start Miralax. (Tr. 693.)

Plaintiff returned to the Gynecologic Oncology Clinic on February 25, 2009. Plaintiff complained of ongoing back pain, which was adequately relieved with Oxycodone, and had no other complaints. Plaintiff reported that her symptoms of psychosis were well controlled. Physical examination was unremarkable, and it was noted that there was no evidence of disease. Plaintiff was diagnosed with chronic pelvic/back pain likely due to radiation fibrosis, well controlled by Oxycodone. (Tr. 732-33.)

Plaintiff reported to Dr. Clarke on January 13, 2009, that she felt "so much better." Plaintiff reported that she was working full time at a nursing home and enjoyed it a great deal. Plaintiff's mood was noted to be good and plaintiff reported normal sleep, appetite, concentration, and energy. Plaintiff reported being engaged in recreational activities and not to have hallucinations, delusions, or suicidal/homicidal thoughts. Mental status examination was normal. Dr. Clarke concluded that plaintiff's symptoms had very much improved. Plaintiff was instructed to continue with Effexor, to decrease her dosage of Ability, and to continue with Dr. Nanna for psychotherapy. (Tr.

707.)

Plaintiff visited Dr. Clarke on April 29, 2009. Dr. Clarke noted plaintiff's mood to be good and plaintiff reported normal sleep, appetite, concentration, and energy. Plaintiff reported being engaged in recreational activities and not to have hallucinations, delusions, or suicidal thoughts. Plaintiff reported that she continued to work in the dietary department at a nursing home and enjoyed the work. Plaintiff reported some continued hypervigilance and low moods at times. Mental status examination was normal. Dr. Clarke concluded that plaintiff's symptoms had very much improved. Plaintiff was instructed to decrease her dosage of Effexor and Ability. Wellbutrin[17] was prescribed. (Tr. 705-06.)

Plaintiff returned to the Gynecologic Oncology Clinic on May 6, 2009. Plaintiff reported having chronic back pain but that it was well controlled with Oxycodone. Plaintiff reported her current pain to be at a level zero. Physical examination was unremarkable. Plaintiff was given a new prescription for Oxycodone. (Tr. 729-31.)

On June 11, 2009, Dr. Clarke completed an Assessment for Social Security Disability Claim in which he reported that plaintiff had been referred to him for evaluation of PTSD. Dr. Clarke reported plaintiff's current symptoms to include low mood,

[17]Wellbutrin is used to treat depression. Medline Plus (last revised Oct. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html>.

hypervigilance, irritability, anger, intrusive recollections, avoidance, and emotional numbness. Dr. Clarke reported that such symptoms resulted in plaintiff's inability to function in the life domains of work, social, and education. In the category of making occupational adjustments, Dr. Clarke opined that plaintiff's ability to follow work rules, relate to co-workers, and interact with supervisors was good. Dr. Clarke further opined that plaintiff's ability to deal with the public, use judgment, deal with work stress, function independently, and be attentive and concentrate was fair. In the category of making performance adjustments, Dr. Clarke opined that plaintiff's ability to understand, remember, and carry out simple job instructions was very good. Dr. Clarke further opined that plaintiff's ability to understand, remember, and carry out complex or detailed job instructions was fair. In the category of making personal-social adjustments, Dr. Clarke opined that plaintiff's ability to maintain personal appearance was good. Dr. Clarke further opined that plaintiff's ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was fair. Dr. Clarke stated that recurrent episodes of PTSD symptoms were probably due to changes in plaintiff's levels of stress. Plaintiff's current treatment was noted to be medication therapy with Abilify and Wellbutrin, and psychotherapy. Dr. Clarke reported that plaintiff's ability to work was unpredictable from episode to episode and that plaintiff's last visit with him showed

her to exhibit recurring flashbacks and hypervigilance.  Dr. Clarke opined that plaintiff should not attempt full-time competitive work at the present time.  (Tr. 741-42, 744.)

## IV.  ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2009. The ALJ further found that plaintiff had not engaged in substantial gainful activity since July 14, 2004, finding that plaintiff's work subsequent to this date did not rise to the level of substantial gainful activity.  The ALJ found plaintiff's cervical cancer in remission, GERD, and anxiety disorders to be severe impairments, but that plaintiff did not have an impairment or combination of impairments which met or medically equaled an impairment listed in 20 C.F.R., Appendix 1, Part 404, Subpart P.  The ALJ found plaintiff to have the RFC to perform sedentary work except that plaintiff

> can lift ten pounds occasionally, can sit for up to six hours per day, walk and stand less than two hours per day, can occasionally climb, balance, stoop, bend, kneel, crouch and crawl; can have no concentrated exposure to excessive noise, dust, fumes, gases or hazards such as unprotected heights or moving machinery.  The claimant will require simple, repetitive work with only occasional interactions with co-workers, supervisors or the general public.

(Tr. 17.)

The ALJ found plaintiff unable to perform her past relevant work.

Considering plaintiff's age, education, work experience, and RFC and crediting Ms. Young's responses to vocational interrogatories, the ALJ determined plaintiff able to perform other work as it exists in the national economy, and specifically, small products assembler.  The ALJ thus determined plaintiff not to be under a disability at any time from July 14, 2004, through the date of the decision.  (Tr. 13-21.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  <u>Coleman</u>, 498 F.3d at 770;

Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Because the ALJ's decision is not supported by substantial evidence on the record as a whole, the decision should be reversed and the matter remanded for further proceedings.

A.    Opinion of Single Decision-Maker

In his decision, the ALJ determined that plaintiff had the RFC to perform sedentary work with certain limitations. In reaching this conclusion, the ALJ noted that "there were no real medical source statements from the claimant's treating providers," and determined to accord little weight to Dr. Clarke's written evaluation inasmuch as, as a physician's assistant, Dr. Clarke was not an acceptable medical source. (Tr. 19.) The ALJ, however, determined to accord great weight to the opinion rendered by the State agency:

The State agency source determined that the

> claimant could sit for six hours per day,
> stand or walk about two hours per day, could
> lift ten pounds occasionally and that she
> could only occasionally climb, balance, stoop,
> bend, kneel, crouch and crawl; can have no
> concentrated exposure to excessive noise,
> dust, fumes, gases or hazards such as
> unprotected heights or moving machinery. The
> State agency opinion is essentially accurate
> and is afforded great weight.

(Id.)

Like Dr. Clarke, however, the "State agency source" was not an acceptable medical source but instead, as conceded by the defendant in his brief, a non-physician "single decision maker" incapable of providing a medical opinion. (Deft.'s Brief, Doc. #20, at p. 10.)

The Regulations require an ALJ to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist." 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). A medical consultant must be an "acceptable medical source," that is, a licensed physician, a licensed optometrist, a licensed podiatrist, or a qualified speech-language pathologist. 20 C.F.R. §§ 404.1616(b), 416.1016(b). Only acceptable medical sources can provide medical opinions. Sloan v. Astrue, 499 F.3d 883, 889 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(a)(2)). In addition, pursuant to Social Security Ruling (SSR) 96-6p, "[f]indings of fact made by State agency *medical and psychological consultants and other program physicians and psychologists* regarding the nature and severity of an individual's impairment(s) must be treated as expert

opinion evidence of nonexamining sources at the administrative law judge . . . level[] of administrative review." SSR 96-6p, 1996 WL 362203, at *34467 (Soc. Sec. Admin. July 2, 1996) (emphasis added). "[T]he administrative law judge . . . must consider and evaluate any assessment of the individual's RFC by a State agency *medical or psychological consultant and by other program physicians or psychologists*." Id. at *34468 (emphasis added).

Within the context of determining plaintiff's RFC, the ALJ cited to SSR 96-6p and stated that he had considered opinion evidence in accordance therewith. (Tr. 17.) Under SSR 96-6p, an ALJ is to treat the opinions of State agency "medical and psychological consultants and other program physicians and psychologists" as expert opinions. In this case, however, the record contains no opinion rendered by such an accepted State agency source. Instead, the only opinion rendered by the State agency, and upon which the ALJ accorded "great weight," was that offered by S. Greenberg, a non-physician "single decision maker" for disability determinations.[18] This was error.

---

[18]This practice has been called into question by a number of courts with such concern aptly summarized by the District Court of Kansas:

> The court is troubled by the Commissioner's use of RFC Assessment forms completed by "single decision makers" who are not "acceptable medical sources" within the meaning of the regulations but who "sign" the forms by placing their name (without title such as Mr., Ms., M.D., or Ph.D.) in the space designated "Medical Consultant's Signature" and without explanation that they are not an "acceptable medical source," a medical

The ALJ's determination as to plaintiff's RFC substantially mirrors the findings made in S. Greenberg's RFC Assessment. The ALJ's citation to SSR 96-6p in his RFC determination strongly suggests that the ALJ weighed the opinion of a lay person under the rules appropriate for weighing the opinion of a medical consultant, "which would be a legal error in applying the ruling." <u>Dewey v. Astrue</u>, 509 F.3d 447, 449 (8th Cir. 2007). While the Commissioner argues that other evidence of record supported the ALJ's decision, the undersigned cannot say that the ALJ's reliance on an unqualified opinion was harmless in light of the ALJ's near-blanket rejection of another, more restrictive opinion for the sole reason that it was not rendered by an acceptable medical source.

Therefore, the ALJ's RFC determination was not supported by substantial evidence on the record as a whole. This cause should be remanded to the Commissioner for a proper assessment of plaintiff's functional limitations resulting from her impairments. Upon remand, the Commissioner should obtain information from acceptable medical sources regarding plaintiff's physical and mental impairments, and properly consider expert opinion evidence. <u>Dixon v. Barnhart</u>, 324 F.3d 997, 1003 (8th Cir. 2003); <u>Nevland v.</u>

---

consultant, or any kind of medical professional. This practice leads to errors where ALJ's accept or rely upon the SDM's RFC assessment as a medical opinion.

<u>Kempel v. Astrue</u>, No. 08-4130-JAR, 2010 WL 58910, at *7 (D. Kan. Jan 4, 2010), and cases cited therein.

<u>Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000); <u>Vaughn v. Heckler</u>, 741 F.2d 177, 179 (8th Cir. 1984).

B.   <u>RFC Finding Precludes Employment</u>

     The ALJ determined that plaintiff had the RFC to perform sedentary work with certain limitations, including that plaintiff could "sit for up to six hours per day, walk and stand less than two hours per day[.]" (Tr. 17.) Plaintiff argues that such an RFC precludes full time employment inasmuch as being restricted to six hours sitting and less than two hours standing and walking would limit her to working less than eight hours per day.  The Commissioner concedes that the ALJ's finding that plaintiff could "walk and stand less than two hours per day" is ambiguous, but argues that what the ALJ *meant* to say was that plaintiff could walk less than two hours per day and stand less than two hours per day, not that she could walk and stand less than two hours in combination.  (Deft.'s Brief, Doc. #20, at p. 11.)

     "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis[.]  .  .  .   A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis in original).  "RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*." <u>Id.</u> (emphasis in original); <u>see also</u> 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

Here, the ALJ found that plaintiff had the RFC to "sit for up to six hours per day, walk and stand less than two hours per day[.]" This statement can reasonably be read to constitute a finding that plaintiff had the ability to "walk and stand," combined, for less than two hours a day. When coupled with the finding that plaintiff could sit for only six hours, plaintiff's RFC would preclude her from performing work on a regular and continuing basis inasmuch as she would be unable to perform work eight hours a day. On the other hand, the Commissioner argues that, because the ALJ ultimately found plaintiff able to perform sedentary work, his ambiguous RFC finding necessarily implies that plaintiff's walking and standing abilities were not meant to be combined, but rather were to be considered separately, that is, that plaintiff could walk less than two hours a day <u>and</u> stand less than two hours a day.

An ALJ's final determination of non-disability is not supported by substantial evidence when it is based upon an ambiguous RFC determination. <u>See</u> <u>Tyner v. Astrue</u>, No. 4:08CV1895 MLM, 2009 WL 2182374, at *13 (E.D. Mo. July 22, 2009). Because the ambiguity involved in this case turns on whether or not plaintiff has the RFC to perform work throughout an eight-hour workday, it cannot be said that the reliance on such an ambiguous RFC determination was harmless. <u>Cf.</u> <u>Wonsewitz v. Astrue</u>, No. 4:11CV1307 MLM, 2012 WL 3548034, at *18 (E.D. Mo. Aug. 16, 2012) (ambiguous RFC determination had no affect on outcome of the case).

The matter should therefore be remanded to the Commissioner for clarification of plaintiff's RFC, keeping in mind that a claimant's ability to do sustained work activities in an ordinary work setting on a regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule.

C.   Pain as a Severe Medical Impairment

Plaintiff argues that, at step 2 of the sequential evaluation, the ALJ erred when he failed to consider her pain as a severe impairment.

Disability is based upon an individual's severe medically determinable physical or mental impairment(s) or combination of impairments.  At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered "severe" if it significantly limits the individual's physical or mental abilities to do basic work activities.  SSR 96-3p, 1996 WL 362204, at *34469 (Soc. Sec. Admin. July 2, 1996).  Pain, while a *symptom* of a medically determinable impairment, is not an impairment in and of itself.  Id.  However, if the individual has a medically determinable impairment that could reasonably be expected to produce symptoms such as pain, symptom-related limitations and restrictions must be considered at step 2 in determining whether the medically determinable impairment is severe.  Id. at **34469–70.  See also 20 C.F.R. §§ 404.1529(b), 416.929(b) (symptoms will not be found to affect a claimant's ability to do basic work activities unless medical signs or laboratory findings show that a

medically determinable impairment is present.)

The ALJ here found plaintiff's cervical cancer in remission, GERD, and anxiety disorders to be severe impairments. The record shows plaintiff to have pain as a residual symptom of her cancer treatments and, indeed, subsequent to step 2 of the analysis, the ALJ noted such residuary pain and back pain to limit plaintiff's functional abilities. (<u>See</u> Tr. 16.) As such, the ALJ considered plaintiff's symptom-related limitations in his analysis. Contrary to plaintiff's argument, however, pain is not in itself a medically determinable impairment. The ALJ therefore did not err at step 2 by failing to find plaintiff's pain to constitute a severe impairment.

D.  <u>Reliance on Inconsistent Testimony of Vocational Experts</u>

Plaintiff argues that the ALJ erred by relying on inconsistent testimony obtained from three vocational experts to find plaintiff not disabled.

A review of the ALJ's decision shows that, in finding plaintiff not disabled, the ALJ relied on answers given by vocational expert Brenda Young in response to vocational interrogatories. (Tr. 20-21.) A review of the hypothetical question posed to Ms. Young, however, shows it not to capture all of plaintiff's limitations as found by the ALJ in his RFC determination.[19]  In the written interrogatory, the ALJ asked Ms.

_____

[19]Even in the absence of the ALJ's ambiguous finding regarding plaintiff's ability to stand and walk, <u>see</u> discussion <u>supra</u> at Section V.B, the interrogatory posed to Ms. Young did not encompass

Young to consider an individual with the following postural limitations: "occasional balance, stoop, crouch, kneel, crawl[.]" (Tr. 312.) In his written RFC determination, however, the ALJ found that plaintiff had additional postural limitations, that is, that she was also limited to only occasional climbing and bending. (Tr. 17.) Because these additional limitations were not included in the hypothetical to Ms. Young, it cannot be said that Ms. Young's response constitutes substantial evidence to support the ALJ's finding that plaintiff can perform work as described by Ms. Young. See Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998).

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole, and the cause should be remanded to the Commissioner for further consideration.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE

Dated this _29th_ day of January, 2013.

---

all of the ALJ's RFC findings as set out in his written decision.